Martine T. Wells, Utah Bar No. 16249
BROWNSTEIN HYATT FARBER SCHRECK, LLP
410 Seventeenth Street, Suite 2200
Denver, CO   80202-4432
Telephone:    303-223-1100
Fax:          303-223-1111
Email:        mwells@bhfs.com

*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| **BLACKBIRD CAPITAL LLC,**<br><br>        Plaintiff,<br><br>v.<br><br>**Worth Group Capital, LLC; Justin Ely; Halls Law Office; Scotia International of Nevada, Inc.; Sion Trading FZE; Max Warren Barber; NaPo Limited; Nikolas Korakianitis; GT Foundation; and Kumar Singh,**<br><br>        Defendants. | **Case No. 2:21-cv-00037-DBP**<br><br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Blackbird Capital LLC ("Blackbird" or "Plaintiff"), by and through its

undersigned counsel, files this Complaint and Jury Demand against Worth Group Capital, LLC

("Worth"), Justin Ely ("Ely"), Halls Law Office ("Halls"), Scotia International of Nevada, Inc.

("SION"), Sion Trading FZE ("SION FZE"), Max Warren Barber ("Barber"), NaPo Limited;

Nik Korakianitis ("Korakianitis"); GT Foundation; and Kumar Singh ("Singh," and collectively,

"Defendants"), and alleges and states as follows:

## NATURE OF THE ACTION

1.     This action arises out of the Defendants' bad faith and fraudulent actions, including breaches of multiple contracts and a pattern of tortious misconduct, related to a $25,000,000 loan Worth agreed to extend to Blackbird in connection with a planned real estate development project in Denver, Colorado.  Based on promises from Worth, Ely, and Halls, Blackbird entered into a loan agreement dated November 4, 2019. This agreement between Worth and Blackbird required Worth to fund the loan on or before November 16, 2019.  To trigger Worth's obligation to fund the loan, and at Worth's direction, Blackbird was required to make a $5,000,000 deposit with Halls pursuant to an August 27, 2019 deposit agreement in which Halls agreed to act as Blackbird's fiduciary.  Blackbird transferred the $5,000,000 deposit amount to Halls on August 28, 2019.  Worth did not fund any part of the loan on or before November 16, 2019, as required, and has not funded any portion since.  For its part, Halls has not returned the $5,000,000 deposit, in violation of both the deposit agreement and its fiduciary duties to Blackbird.

2.     Blackbird has now discovered that Worth's and Halls' failure to fund the loan and return the deposit is not merely limited to a standard breach of contract, but rather is part of a larger scheme involving some, if not all, of the Defendants to defraud involving numerous parties who induce would-be borrowers into transferring large sums of money as deposits on loans that never fund, with the deposits transferred overseas and all but disappearing. Fraud has been perpetrated against at minimum eight other individuals and companies in at least seven states in the United States and in at least one province in Canada.

3.     In Blackbird's case, Worth, Ely, Halls, and Barber, who is acting as an agent and

intermediary individually and through SION and SION FZE, along with NaPo Limited, Korakianitis, GT Foundation, and Singh, have engaged in a series of delay tactics, including by making multiple representations and promises to Blackbird that have turned out to be false and making several offers of substitute or additional deals to cover the loan and the deposit that were not valid.  At this point, because of Defendants' conflicting representations and delay tactics, Blackbird has no way to know where its deposit is located and in whose possession. As a consequence, Blackbird has been damaged no less than $22,000,000.

## PARTIES

4.      Plaintiff Blackbird is a real estate development company based in Des Moines, Iowa.  Its sole member, Justin Doyle, is a resident of Iowa.

5.      Defendant Worth is a Wyoming limited liability company in the financial services industry with a principal place of business at 1621 Central Avenue, Cheyenne, WY 82001.

6.      Defendant Ely is an individual and resident of Utah, and is Worth's managing member.

7.      Defendant Halls is a law firm with a registered office at 4047 North Ptarmigan Place, Suite 101, Star, Idaho 83669.  William Halls ("Mr. Halls") is a lawyer at this law firm.

8.      Defendant SION is a Utah corporation with a principal place of business at 4455 S. 700 E., Suite 300, Salt Lake City, Utah 84101.

9.      Upon information and belief, Defendant SION FZE is a single shareholder limited liability company formed in the United Arab Emirates and owned by Barber.

10. Upon information and belief, Defendant Barber is an individual and resident of Utah, the Vice President of International Trade and registered agent of SION, and owner of SION FZE.

11. Upon information and belief, Defendant NaPo Limited is a company located and incorporated in Bridgetown, Barbados, and Saint Lucia. NaPo is represented by Defendant Korakianitis, who, upon information and belief, is its founder.

12. Upon information and belief, Defendant Korakianitis is a Canadian citizen, is a representative of NaPo Limited, and knows Barber through gold and other trading with each other.

13. Upon information and belief, GT Foundation is a private interest foundation founded in Panama City, Panama with a registered office located at PTY 296, P.O. Box 0832-7245, WTC, Panama City, Panama. GT Foundation may have an office in London, England and/or New York, New York.

14. Upon information and belief, Defendant Singh is a managing director for GT Foundation.

**JURISDICTION AND VENUE**

15. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because there is complete diversity of citizenship between Plaintiff and Defendants and the matter in controversy exceeds $75,000, exclusive of interest and costs.

16. Specifically, there is complete diversity of citizenship because Blackbird and its sole member are both residents of Iowa. None of the Defendants are residents of Iowa, nor are

any owners of Worth.  Instead, Defendants are residents of other states or nations as set forth more fully below.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events and omissions giving rise to the claims asserted herein occurred in Utah.

18.     Specifically, with respect to Worth, venue is appropriate because the Settlement Agreement (as defined below) between Worth and Blackbird specifies state or federal court in Utah as the appropriate venue for the resolution of disputes between the parties.  Further, Worth's managing member, Ely, is a resident of Utah.  In his capacity as Worth's managing member, Ely engaged in a substantial part of the acts and omissions giving rise to the claims asserted against Worth herein while he was located in Utah.

19.     With respect to Ely, venue is appropriate because he is a resident of Utah and he engaged in a substantial part of the acts and omissions giving rise to the claims asserted herein while located in Utah.

20.     With respect to Halls, although the Deposit Agreement (as defined below) between Halls and Blackbird specifies state or federal court in Iowa as the appropriate venue for the resolution of disputes between the parties, Halls has consented in writing to venue in this Court.

21.     With respect to Barber and SION, venue is appropriate because SION is an entity incorporated in Utah, with its principal place of business in Utah, and Barber purportedly serves as its Vice President of International Trade.  Many of SION's and Barber's acts and omissions giving rise to Blackbird's claims occurred in Utah.

5

22.     With respect to SION FZE, venue is appropriate because Barber exercises complete dominion and control over SION FZE and ignores the corporate formalities of this entity.  Many of SION FZE's acts and omissions giving rise to Blackbird's claims were conducted by Barber on SION FZE's behalf in Utah.

23.     With respect to NaPo Limited, Korakianitis, GT Foundation, and Singh, venue is appropriate because Blackbird's deposit was sent to a bank in Utah before being transferred to the GT Foundation, and many of the acts and omissions which form the basis of a conspiracy committed by the Defendants originated in Utah.

## GENERAL ALLEGATIONS

### Blackbird's Business and Relationship with Worth and Halls

24.     Blackbird is a real estate development company based in Des Moines, Iowa. The majority of projects within Blackbird's portfolio further Blackbird's mission to provide social benefits for the community in which it resides.  These projects include affordable housing, healthcare, senior living, student housing, and ministry growth.

25.     In late 2018, Blackbird began to pursue the acquisition, development, ownership, management, and control of property located at SWC East 16th Ave and Logan Street, Denver, CO 80203 and owned by the non-profit entity, Two Spires Evangelical Holdings, LLC (the "Project").

26.     To fund the Project, Blackbird required financing through a third-party loan known as a credit facility.

27.     Blackbird was subsequently introduced to Worth through a mutual contact.

28.     Upon information and belief, Worth provides a lending platform to enable non-traditional loan structures.

29.     Worth, through Ely and Worth's attorney, Halls, made several promises to Blackbird that induced Blackbird to seek a loan through Worth.  Specifically, and among other promises, Worth and Halls promised a below-market interest rate loan due to the philanthropic nature of Blackbird's business, flexibility in collateral and mortgage security, and that Blackbird's deposit (a requirement of the loan) would be fully insured.

30.     The insurance promised on Blackbird's deposit—ensuring its protection and eliminating any risk of loss to Blackbird—was of particular importance to Blackbird's decision to move forward with Worth and Halls.  Blackbird would not have advanced the Deposit without the security.

31.     Based on these promises, Blackbird signed a loan facility term sheet (the "Term Sheet") on August 20, 2019. A true and accurate copy of the Term Sheet is attached hereto as **Exhibit A**.

32.     Blackbird then discussed the Project with Medallion Capital, LLC ("Medallion"), a company that shares Blackbird's commitment to philanthropy, and the possibility that Medallion would loan money to Blackbird as part of the loan structure described in the Term Sheet.

33.     Based on these discussions, Medallion agreed to fund the deposit on Blackbird's behalf.

### The Lending Agreement between Blackbird and Worth

34.     On November 4, 2019, Blackbird and Worth entered into a Lending and Security Agreement (the "Lending Agreement"), in which Worth agreed to loan Blackbird up to $25,000,000 (the "Loan").  A true and accurate copy of the Lending Agreement is attached hereto as **Exhibit B**.

35.     The Lending Agreement was amended by the Amendment to Lending and Security Agreement, dated November 14, 2019 (the "Amendment").  A true and accurate copy of the Amendment is attached hereto as **Exhibit C**.

36.     The Project was to be funded from the Loan proceeds directly or indirectly through a sub loan.

37.     The sub loan refers to a loan made by Blackbird from the Loan proceeds to a limited liability company, corporation, partnership, or other entity.  The initial sub-borrower contemplated by Blackbird was Two Spires Evangelical Holdings, LLC, a Colorado non-profit limited liability company.

38.     Mr. Halls (as a representative of Halls) negotiated and drafted the Lending Agreement as Worth's attorney.

39.     The Lending Agreement was signed by Ely as the Managing Member of Worth.

40.     The Lending Agreement required that both Blackbird and Worth would provide a portion or percentage of the total Loan amount.

41.     Specifically, Blackbird would provide $5,000,000, or 20% of the total Loan principal, as a deposit (the "Deposit") on the loan to induce Worth to fund the remaining principal of the Loan.

42.     In turn, Worth would provide 80% of the total Loan principal, or $20,000,000.

43.     The Initial Tranche (as defined in the Lending Agreement) of Worth's portion of the Loan was due on or before November 17, 2019.

44.     On November 15, 2019, and in connection with the Lending Agreement, Blackbird executed a promissory note in favor of Worth for the principal sum of $25,000,000.

**The Deposit Agreement between Blackbird and Halls**

45.     In consideration of Worth's extension of the Loan pursuant to the terms of the Lending Agreement, on August 28, 2019 Blackbird in good faith made the Deposit with Halls acting as escrow agent.  The $5,000,000 represents Blackbird's 20% of the total Loan amount.

46.     Blackbird made the Deposit pursuant to a deposit agreement, dated August 27, 2019, between Blackbird and Halls (the "Deposit Agreement").  A true and accurate copy of the Deposit Agreement is attached hereto as **Exhibit D**.

47.     The Deposit was transferred from Blackbird's bank in Denver, Colorado to Halls' account in Kamas, Utah.

48.     Blackbird borrowed the funds necessary to make the Deposit from Medallion pursuant to a separate loan agreement and promissory note (collectively, the "Medallion Agreement").

49.     Pursuant to the Deposit Agreement, Halls was to provide a surety bond for the $5,000,000, naming Medallion as an additionally insured under Halls' insurance policy.

50.     As with the Lending Agreement, the security of the Deposit through a surety bond was instrumental in Blackbird entering into the Deposit Agreement and to Medallion agreeing to lend the funds for the Deposit to Blackbird pursuant to the Medallion Agreement.

51.     As part of the negotiations, Worth (through Ely) and Halls (through Mr. Halls) verbally and in writing told Blackbird that Medallion would be named and was named as an additionally insured under Halls' insurance policy.

52.     The Deposit Agreement required Halls to return the Deposit to Blackbird after 12 months if it had not already been returned.

53.     The Deposit Agreement also permitted Blackbird to receive repayment of the entire Deposit by demanding its return upon 60 days' notice to Halls in writing.

54.     The Deposit Agreement provided that after the $5,000,000 in escrow was returned to Medallion, the Loan would serve as a line of credit for Blackbird of $20,000,000.

**Worth's and Halls' Contractual Breaches and Misrepresentations Related Thereto**

55.     Worth did not have the funds to fund the Loan.  Upon information and belief, Worth either intended to fund the Loan with the assistance of other organizations, including NaPo Limited and GT Foundation, as part of a larger series of transactions, or never intended to fund the Loan at all.

56.     Regardless, in breach of the Lending Agreement, Worth did not fund the Initial Tranche as required by November 17, 2019.

57.     In fact, to date, Worth has not funded any portion of the Loan as required by the Lending Agreement, despite the fact that Blackbird has performed its obligations under the Lending Agreement, including by making the Deposit with Halls.

58.     Upon information and belief, Halls forwarded the Deposit to GT Foundation in Panama City, Panama in accordance with an agreement, dated September 3, 2019, between GT Foundation and Halls (the "GT Foundation Agreement").  A true and accurate copy of the GT Foundation Agreement as provided to Blackbird by Halls is attached hereto as **Exhibit E**.

59.     Singh signed the GT Foundation Agreement as its managing director.

60.     On January 16, 2020, Blackbird wrote to Halls to provide Halls 60 days' written notice required under the Deposit Agreement that Blackbird wanted the Deposit returned to it in

full by March 20, 2020 (the "Notice"). A true and accurate copy of the Notice is attached hereto as **Exhibit F**.

61.     Halls responded that the Notice was defective under the Deposit Agreement because the Notice was not provided irrespective of its effect on the Lending Agreement and the Notice specified that it was not intended to terminate the Lending Agreement.

62.     However, the Deposit Agreement makes no mention of any requirement related to effects on the Lending Agreement if a demand is made for the return of the Deposit.

63.     As such, Halls had no valid basis for declining to return the Deposit per Blackbird's request.

64.     Thereafter, Ely and Barber, who became involved in response to issues regarding the promised surety bond that was to protect the Deposit as described more fully below, represented to Blackbird that the security default would be perfected through an alternative structure and thus there was no need for the return of the Deposit at the time.

65.     On April 30, 2020, Ely, on behalf of Worth, also sent Blackbird a letter affirming that Worth was still planning to fund the Loan (the "April Letter"). A true and accurate copy of the April Letter is attached hereto as **Exhibit G**.

66.     The April Letter expressed that the Loan had cleared all compliance hurdles and that there were no technical issues preventing the transaction in the Lending Agreement from proceeding.

67.     The April Letter also represented that the closing on the Loan had been delayed due to external circumstances outside of Worth's control and that, although the Loan was being processed in a large queue, it was near the front of that queue.  Ely expressed, however, that

11

Worth did not have a committed date for closing on the Lending Agreement because its understanding was that the Loan may not arrive at the front of the queue until the end of May 2020.

68.     On May 8, 2020, Ely sent Blackbird another letter on behalf of Worth regarding the Loan and Lending Agreement (the "May Letter").  A true and accurate copy of the May Letter is attached hereto as **Exhibit H.**

69.     The May Letter represented that when the Deposit was sent to Halls, "this set a number of things in motion to create the liquidity to fund Blackbird's credit facility."

70.     The May Letter then represented that the Deposit had been transferred to another attorney-client trust account, which is still held on account in London, England, and that these funds have never been touched and are still in place. At the time of the representation, Blackbird had no reason to believe it was false.  Since that time, however, Blackbird has been unable to verify the representation and has not received any documents in support.

71.     The May Letter next represented that the "Family Office," upon receipt of these funds, along with other parties who are participating in the creation of their credit facilities, moved to liquidate one of their banking instruments, which is a cash-backed Standby Letter of Credit ("SBLC") from HSBC Bank in London, England.  Ely further stated that while this process is normally a 35-banking day contract and there are generally no problems or obstacles that arise in these transactions, they were selling this instrument to Santander Bank out of Santiago, Chile, and Chile began to face significant issues of civil unrest starting in October 7, 2019.

72.     Upon information and belief, the Family Office referenced in the May Letter is NaPo Limited and/or its representative Korakianitis.

73.     The May Letter further represented that riots in Chile resulted in shutting down the country and prevented Worth's bankers from closing on the Lending Agreement.

74.     While Blackbird did not know it at the time, the May Letter's representation regarding the impact of civil unrest in Chile on Santander Bank was apparently false. According to Santander Bank's investor relations chief: "Although there has been increased volatility in the local market this past week, the impact on our operations has been minimized thanks to our digital strategy, which has been able to support the branch network and serve our clients over this period." *See Chile protests: Santander's view on loan growth, the economy*, BNAMERICAS (Nov. 1, 2019), https://www.bnamericas.com/en/features/chile-protests-santanders-view-on-loan-growth-the-economy.

75.     The May Letter also provided another reason for delay.  It stated that the situation in Chile resulted in the decision to transfer the funds back to London in November 2019, but the withdrawal of the United Kingdom from the European Union ("Brexit") and year-end issues caused further delays until March of 2020.

76.     While Blackbird did not know it at the time it received the May Letter, upon information and belief, Brexit did not cause multi-month delays in the financial industry.

77.     The May Letter then provided a third reason for delays: the Covid-19 pandemic, which the letter represented forced closures and staff to attempt to work from home.

78.     Finally, the May Letter represented that Worth and the Family Office were working to provide liquidity and relief to Blackbird and requested that Blackbird extend them "a little more grace."

79.     In reliance on Worth's numerous promises and representations in the May Letter and in various other communications to Blackbird that it would fund the Loan by a date certain, and that the delays were out of Worth's hands, Blackbird refrained from pursuing any legal action.

80.     On June 4, 2020, Singh, on behalf of GT Foundation, sent Halls a letter and copied Blackbird (the "GT Letter").  A true and accurate copy of the GT Letter is attached as **Exhibit I**.

81.     In the GT Letter, GT Foundation represented that the Deposit is "fully being securitized and principal under deposit with the foundation in control of it."  The letter then blamed the Covid-19 pandemic for the delay but stated that GT Foundation "expect[s] at any moment the funds will be released and that they will settle into our accounts for further credit to you."

82.     Ely also represented to Blackbird on a phone call in June of 2020 that the underlying financial instrument needed to fund the Loan finally sold and that GT Foundation was going to proceed with distributions in a few business days.

83.     On June 16, 2020, as a result of the fact that no portion of the Loan had been funded despite Worth's and GT Foundations' representations to the contrary, Blackbird again requested the return of the Deposit in a letter to Halls, provided 60 days' notice, and specified

that the request was unconditional and unqualified (the "Second Notice").  A true and accurate copy of the Second Notice is attached as **Exhibit J**.

84.     In breach of the Deposit Agreement, Halls did not return the Deposit after 60 days, and has not returned it since.

85.     Rather, Mr. Halls, on behalf of Halls, represented that he would make requests for the return of the Deposit but that the Deposit's return was outside of Halls' control.  Although the GT Foundation Agreement provides that Halls only has to provide 30 days' notice for a return of the Deposit, Blackbird is unaware of whether Mr. Halls ever provided such notice to GT Foundation.

**The Defendants' Misrepresentations Regarding the Surety Bond**

86.     As described above, Halls' and Worth's representations that the Deposit would be protected by a surety bond was essential to Blackbird's decision to enter into the Lending Agreement and Deposit Agreement.

87.     Nevertheless, after signing the Lending Agreement and the Deposit Agreement, Blackbird discovered that the represented surety bond is not, in fact, a surety bond.  Rather, it is an insurance policy for wrap and crime that does not include Medallion as an insured third party.

88.     Blackbird made this discovery when it and Medallion began thoroughly reinvestigating all aspects of the transaction in January of 2020 because of the extended delay in performance by Worth.  Over the next several months, Blackbird communicated directly with the insurance broker for SION and learned that there was no surety bond for Medallion's benefit as promised.

89.     After making this discovery, Blackbird confronted Halls and Worth, and threatened legal action against Halls, Worth, and Ely.  Halls and Worth, through Mr. Halls and Ely respectively, alternated between explaining to Blackbird on the one hand that they had also been misled about the surety bond and on the other hand contending that the actual policy was what they had promised both verbally and in the Deposit Agreement.

90.     Halls and Worth eventually offered to perfect the agreement through other means, in at least tacit recognition that the insurance policy provided no security for the Deposit to either Blackbird or Medallion.

91.     To provide security in lieu of a surety bond, on July 7, 2020, Ely swore before a notary an Affidavit of Worth Group Capital LLC – Safe Keeping Receipt Assignment (the "Affidavit").  A true and accurate copy of the Affidavit is attached as **Exhibit K**.

92.     In the Affidavit, Ely represents that Worth was issued a Safe Keeping Receipt by G4S Bahrain reference number GWA-1, under Security Seal No #101-8094-5733-7, under the account of Trade License No 5012510 and pledged under Halls for the benefit of Worth Group Capital, for 6,379 kilograms of gold, which at the time was valued at approximately $350,000,000 (the "SKR").  A true and accurate copy of the SKR as provided by Ely is attached as **Exhibit L**.

93.     The Affidavit further represents that Worth assigned a portion of the SKR amounting to 440 kilograms of gold to Blackbird and that the assignment may be revoked only after Blackbird has received all amounts due and owing to it under the Lending Agreement, as amended.

16

94.     While Blackbird did not know it at the time, Ely's—and by extension, Worth's—representations in the Affidavit were false.  Specifically, upon information and belief, either the SKR is fraudulent and invalid, or Barber, not Worth, has access to the SKR.

95.     Further, upon information and belief, Worth has no ability to assign a portion of the SKR, whether to Blackbird or anyone else.

96.     One day after Ely executed the Affidavit, on July 8, 2020, Blackbird sent Worth a letter stating that Worth had failed to deliver any of its portion of the Loan ($20,000,000) as of that date and demanding that Worth honor the terms of the Lending Agreement and deliver the entire balance of Worth's portion to Blackbird by 3:00 pm Central Standard Time on Friday, July 10, 2020 (the "Demand").  A true and accurate copy of the Demand is attached as **Exhibit M**.

97.     The Demand also expressed that in the event Worth failed to meet this deadline, Blackbird intended to immediately exercise all of its rights under the Affidavit and the SKR based on its belief at the time that the SKR was valid and enforceable.

98.     After speaking with Ely, on July 9, 2020, Blackbird rescinded the demand for $20,000,000 by July 10, 2020, based on Ely's representations in the Affidavit that Blackbird's Deposit and Loan proceeds were protected by and could be monetized through the SKR (the "Rescission Letter").  A true and accurate copy of the Rescission Letter is attached as **Exhibit N**.

99.     That same day, Blackbird sent an email to the point of contact at G4S listed on the SKR and asked G4S to confirm the authenticity of the SKR and to provide instructions for monetizing the underlying asset.

100.     Soon thereafter, Ely called Blackbird and demanded that Blackbird recall its correspondence with G4S.  He also expressed that Blackbird should get a proposal from a

bank to monetize the SKR, and once Blackbird had that proposal it should send the proposal to him, and in turn, Worth would issue a new SKR directly to that bank.

101.     Blackbird sent another email to G4S the following day stating that it would work through the account holder directly.

102.     G4S responded a day later, expressing that it cannot communicate with Blackbird and that the email Blackbird sent is effectively a breach of G4S's contract with the account holder. G4S warned the account holder to comply with the contract or G4S would cancel the account, and stated that Blackbird, Halls, and Worth are not G4S's clients.

103.     G4S's response copied Barber at max@siontradingfze.com and Wali Badshah at wali@siontradingfze.com. Upon information and belief, Barber and/or SION FZE is the G4S account holder referenced by G4S.

104.     Blackbird subsequently contacted Halls, expressing that Blackbird needed verification from G4S confirming that the SKR is indeed valid and for additional information on its monetization for Blackbird's benefit.  Nothing meaningful was provided in response.

105.     Rather, on July 13, 2020, Ely sent an email to Blackbird regarding an additional line of credit, apparently offering yet another alternate route for financing the Loan.  Although Worth verbally expressed approval for this line of credit, it was never signed and Worth never referenced it again.

106.     On about July 16, 2020, Korakianitis and Ely represented to Blackbird that HSBC Bank would send the loan proceeds from GT Foundation's account to Wells Fargo in the United States, but that first the funds would pass through some type of international processing regimen. Due to supposed restructuring, Korakianitis and Ely represented that Blackbird should only

expect $5,000,000 out of the first tranche, and a second funding event would be coming behind it shortly (within a matter of days) where Blackbird would receive the rest of the Loan proceeds.

107.    Korakianitis and Ely further represented that Blackbird would receive $5,000,000 from Wells Fargo to satisfy Worth's obligations under the Lending Agreement but that if the money arrived before the Deposit was returned, then the $5,000,000 would apply to the Deposit.

108.    On August 3, 2020, Worth provided Blackbird a "SWIFT" document representing that the transfer of money between banks had occurred. SWIFT is an international messaging network used to communicate sensitive information (such as account details) among financial institutions.

109.    Using the SWIFT document as support, Ely and Korakianitis represented to Blackbird that Blackbird should expect its portion of this tranche to arrive in its accounts within 48 hours and then a second tranche would arrive a few days later with the balance of the Loan proceeds.

110.    Despite these representations, Blackbird did not receive any funds within 48 hours or at any time thereafter.

111.    Approximately ten days later, Korakianitis and Ely represented to Blackbird that the SWIFT code was incorrect and needed to be corrected.  Ely later represented to Blackbird that the code had been updated and the money had been received by Wells Fargo, and Blackbird would soon receive its share.

112.    Despite further assurances that the money would be arriving within a few business days, none ever arrived.

**The Settlement Agreement between Blackbird and Worth**

19

113.     In apparent recognition that Blackbird would be forced to take legal action to protect its interests if there were any further delays, Worth and Ely agreed to renegotiate certain terms of the Lending Agreement, fund the Loan, and settle Blackbird's potential claims against it through the parties' August 28, 2020 Second Amendment to Lending and Security Agreement Including Settlement and Release of Claims (the "Settlement Agreement"). A true and accurate copy of the Settlement Agreement is attached as **Exhibit O**.

114.     Specifically, the Settlement Agreement required Worth to, among other things: (1) cause Halls to return the Deposit through a direct payment to Medallion; (2) fund the balance of the loan of $20,000,000 , less origination fees; and (3) pay Blackbird $1,600,000 as compensation for its damages caused by the delay of funding the Loan (the "Settlement Payment").

115.     Worth agreed to take each of these actions on or before September 10, 2020.

116.     In return, Blackbird agreed to release its claims against Worth as long as Worth fulfilled its obligations under the Settlement Agreement by September 10, 2020.

117.     The Settlement Agreement is governed by the laws of the State of Utah and specifies state or federal court in Utah as the proper jurisdiction and forum for resolving any disputes between the parties.

118.     Worth conditioned the signing of the Settlement Agreement on changing the governing law and forum for resolving any disputes from Colorado to Utah.

119.     Blackbird consented to the Settlement Agreement based not only on Worth's promises, but also based on representations by Barber (on behalf of SION and SION FZE) and

Korakianitis (on behalf of NaPo Limited) that the Loan and the Settlement Payment would be funded imminently.

120.    Specifically, Barber and Korakianitis represented that the Loan proceeds were pending in Wells Fargo's account, had originally arrived in European currency, and only had to go through the foreign exchange process before being released. They stated that the money would be released to SION FZE's account and then would be distributed to Blackbird through Halls, rather than Worth.

121.    Barber and Korakianitis also represented that filing litigation against them would only slow down Blackbird's receipt of the Deposit and Loan proceeds.

122.    Despite inducing Blackbird to refrain from taking legal action and memorializing its numerous promises in the Settlement Agreement, Worth once again failed to fund any aspect of the Loan, make the Settlement Payment, or meet its other financial commitments to Blackbird by September 10, 2020 as promised.

123.    Rather, consistent with its other communications, Ely again asked Blackbird to give Worth additional time to fund the Loan.

124.    Upon information and belief, Worth never intended to fund the Loan or the Settlement Payment, and instead executed the Settlement Agreement as a way to further delay any legal action by Blackbird.

**Barber's Misrepresentations to Blackbird Regarding the Loan and Deposit**

125.    Starting in mid-September of 2020, Blackbird began receiving direct communications from Barber regarding the processing of the Loan proceeds.

126.    Blackbird believes that Barber became involved because Blackbird threatened litigation against SION due to the misrepresentations regarding the promised surety bond and SION FZE regarding the SKR.

127.    Upon information and belief, Barber is an agent of Worth, GT Foundation, and NaPo Limited (in addition to being an agent of SION and exercising complete dominion and control over SION), tasked with preventing Blackbird from taking legal action with regard to the return of the Deposit or funding of the Loan.

128.    Barber represented to Blackbird that Loan proceeds had transferred from HSBC Bank to Deutsche Bank to Wells Fargo's international bank in a series of communications between September 14, 2020 and October 5, 2020.  Barber also accused Wells Fargo of playing games and needlessly holding his deposits.

129.    Barber also referenced an error in the SWIFT code initially that slowed down the transfer between Deutsche Bank and Wells Fargo while it was being fixed.

130.    Barber also represented that the international side of Wells Fargo had to process the funds through international customs, and that this process would finish in mid- to late-September.  During this time, Barber repeatedly represented that he simply needed to initiate the wire and that then, at a minimum, Blackbird would receive the Deposit back.

131.    Barber separately made the inconsistent representation that Wells Fargo refused to authorize the wire and that his attorney was attempting to push Wells Fargo.  He stated that his attorney believed that Wells Fargo would release the funds at the end of September 2020 to avoid regulator issues for holding on to the funds for so long.

132.     Blackbird does not know whether Wells Fargo released any funds to Barber or any other party by the end of September 2020.  Regardless, Blackbird did not receive any funds at that time, whether directly from Wells Fargo, or from Barber, SION FZE, SION, or any other party.

133.     On October 6, 2020, representatives for Blackbird traveled to Utah to meet with Ely and Barber. Barber represented that Wells Fargo's anti-money laundering department claimed that it needed to investigate the sources of the funds to ensure that the bank was not participating in illicit transfers.  Barber represented that HSBC Bank and Deutsche Bank also did this, but that the investigations performed by those banks did not take as long.

134.     In addition, Barber promised that SION would soon transfer sufficient funds to Worth (directly or through Halls), who in turn would refund the Deposit directly to Blackbird by Thursday, October 29, 2020, and would make the Settlement Payment and fund the Loan in full shortly thereafter.

135.     During this same time period, Barber informed Blackbird of SION's intention to provide funding to Worth so that it could in turn fund the Loan.

136.     Barber likewise has asked Blackbird repeatedly to refrain from initiating legal action based on its promises to Blackbird of providing additional information on the Deposit and Worth's ability to fund the Loan.  Further, Barber repeatedly has represented that if Blackbird initiated legal action, the return of the Deposit and funding of the loan would be made much more difficult, if not impossible.

137.     Despite subsequent verbal promises, Barber has not provided any dependable information. In fact, although Barber represented he was only involved in the transfer of funds

and not the underlying transaction, upon information and belief, Barber is integral to the transaction, has utilized the situation to make payment more challenging, and has made a series of false promises to Blackbird in an effort to delay Blackbird from pursuing its legal rights or reporting the apparent fraud to any regulatory or criminal authorities.

**Defendants' Unfulfilled Promises to Blackbird**

138.    Over 12 months have passed since the date of the Deposit Agreement and the Lending Agreement.

139.    Neither Halls nor any other party has returned any portion of the Deposit to Blackbird.

140.    Rather, Blackbird was forced to use other sources to satisfy its obligations to Medallion pursuant to the Medallion Agreement after Medallion threatened a lawsuit.

141.    Blackbird also has not received any funds that were to be part of the Loan.

142.    Upon information and belief, the Deposit has not been returned to Blackbird and the Loan has not been funded because such funds are improperly being used elsewhere, potentially in deals with other affiliates of Worth including GT Foundation, NaPo Limited, SION, and SION FZE.

143.    Upon information and belief, the SKR is either fraudulent and invalid or remains in Barber's name and Worth has no ability to assign a portion of the apparent gold to Blackbird, nor does Blackbird have any ability to monetize it.

144.    Despite multiple attempts, Blackbird has been unable to obtain the gold referenced in the SKR or convert it into cash.

145.     Upon information and belief, Barber has used SION and SION FZE as mere instrumentalities and alter egos of himself.  Thus, Barber should be personally liable in connection with the claims asserted in this Complaint against SION and SION FZE.

**Blackbird's Discovery of Defendants' Fraud**

146.     Through the course of preparing for this litigation, Blackbird has discovered similar fact patterns to the fraudulent scheme alleged herein in other lawsuits and criminal investigations involving Barber, SION, SION FZE, NaPo Limited, Korakianitis, GT Foundation, and Singh (collectively, the "Co-Conspirators").

147.     Specifically, Blackbird is now aware of at least eight other parties (the "Victims") who have agreed to similar loan structures as the Loan Agreement, made significant cash deposits to one or more of the Co-Conspirators and/or their affiliates as a condition of their loan, and then never received the loan proceeds or a return of their deposit.  The Victims are located in at least seven states in the United States and in at least one province in Canada.

148.     Central to each of these Victims' claims are ongoing and long-term efforts by one or more of the Co-Conspirators to delay and mislead by making false representations regarding why the loans have not been funded and deposits have not been returned.

149.     As an example, in one instance, one of the Victims alleges that Barber stated that the delay was caused by a break-in to Barber's office.  As in this case, and upon information and belief, the Co-Conspirators' goal in making these misrepresentations is to thwart the Victims from pursuing either civil or criminal charges against them to secure the return of their deposited funds.

**Blackbird's Damages**

150.     Blackbird has suffered significant losses and harm to its business as a direct result of Defendants' actions as described in this Complaint.  Blackbird's losses include not only the disappearance of the $5,000,000 Deposit, but also numerous other damages.

151.     As an example, because Blackbird has not received a return of its Deposit, and because the Loan has never been funded, Blackbird was forced to forgo the Project.  In so doing, Blackbird lost its deposit on the Project, had to sell the property associated with the Project at a substantial loss, and owed significant default payments to its partners and investors.

152.     As another example, Blackbird had to repay the $5,000,000 it owed to Medallion, causing it to scramble to raise the necessary cash to do so.  As a direct consequence, Blackbird was forced to default on certain other debt, which in turn caused it to incur significant interest, penalties, and related costs, as well as the loss of certain assets.

153.     In total, Blackbird's damages resulting directly from Defendants' conduct is no less than $22,000,000.

## CAUSES OF ACTION

### COUNT I
**(Breach of Contract against Worth)**

154.     Blackbird incorporates all previous paragraphs as if fully set forth herein.

155.     Blackbird and Worth entered into the Lending Agreement, as modified by the Amendment and the Settlement Agreement.

156.     The Lending Agreement, as modified by the Amendment and the Settlement Agreement, is a valid and enforceable contract.

157.    Blackbird fulfilled its obligations under the Lending Agreement, as modified by the Amendment and the Settlement Agreement, by depositing the $5,000,000 required under that agreement.

158.    Worth originally breached the Lending Agreement by failing to provide any part of its portion of the Loan, which was $20,000,000 (including the Deposit), less origination fees, on or before November 16, 2019.

159.    Worth also breached multiple provisions of the Settlement Agreement by failing to fund any aspect of the Loan, make the Settlement Payment of $1,600,000, or meeting its other financial commitments to Blackbird by September 10, 2020 as promised.

160.    These failed promises include a failure to cause Halls to return the Deposit through direct payment to Medallion.

161.    Blackbird was damaged by Worth's breach of the Lending Agreement, as modified by the Amendment and the Settlement Agreement.

162.    By entering into the Lending Agreement and Settlement Agreement with no intention of providing Blackbird any of the benefits in those agreements, Worth has likewise violated the implied covenant of good faith and fair dealing inherent in those agreements.

163.    Worth's actions thus were willful and malicious.

164.    Blackbird was damaged because Worth breached the Affidavit.

## COUNT II
### (Breach of Contract against Halls)

165.    Blackbird incorporates all previous paragraphs as if fully set forth herein.

166.    Blackbird and Halls entered into the Deposit Agreement.

167.    The Deposit Agreement is a valid and enforceable contract.

168.     Blackbird fulfilled its obligations under the Deposit Agreement by causing the Deposit to be forwarded to Halls under that agreement.

169.     Despite multiple demands made by Blackbird, Halls has breached and continues to breach the Deposit Agreement by failing to return the Deposit after Blackbird provided Halls 60 days' notice in writing.

170.     Halls also breached the Deposit Agreement by failing to return the Deposit after 12 months as required under the Deposit Agreement.

171.     Halls further breached the Deposit Agreement by failing to provide a surety bond for the $5,000,000 and naming Medallion as an additionally insured under Halls' insurance policy.

172.     By entering into the Deposit Agreement with no intention of providing Blackbird any of the benefits in that agreement, Halls has likewise violated the implied covenant of good faith and fair dealing.

173.     Halls' actions thus were willful and malicious.

174.     Blackbird was damaged because Halls breached the Deposit Agreement.

## COUNT III
### (Breach of Fiduciary Duty against Halls)

175.     Blackbird incorporates all previous paragraphs as if fully set forth herein.

176.     A fiduciary relationship exists between Halls and Blackbird because there is a relationship of trust stemming from Blackbird depositing $5,000,000 with Halls acting as an escrow agent, and because Halls agreed to act as Blackbird's fiduciary in the Deposit Agreement.

177.     As a result, Halls owed to Blackbird fiduciary duties of care and loyalty.

178.     Halls breached this fiduciary duty by accepting the Deposit from Blackbird and then transferring that Deposit to a third party without adequately ensuring the Deposit would be returned to Blackbird, by failing to adequately secure a surety bond or other insurance to protect the Deposit, and by failing to return the Deposit to Blackbird.

179.     Blackbird's injuries were the natural and direct consequence of Halls' decision to transfer the money to an untrustworthy source and failing to protect the Deposit through a valid surety bond or otherwise.

180.     Blackbird has been damaged by Halls' willful and malicious actions because it has lost $5,000,000 and has lost business opportunities, among other substantial damages.

## COUNT IV
**(Aiding and Abetting Breach of Fiduciary Duty against Worth, Ely, SION, SION FZE, Barber, NaPo Limited, Korakianitis, GT Foundation, and Singh)**

181.     Blackbird incorporates all previous paragraphs as if fully set forth herein.

182.     Through its actions, such as entering into the Settlement Agreement and representing that the Deposit would be returned to Blackbird, Worth and Ely knowingly joined Halls in fraudulently depriving Blackbird of the Deposit through the breach of Halls' fiduciary duties owed to Blackbird.

183.     Through facilitating the subsequent transactions involving the Deposit, and through a variety of misrepresentations and delay tactics as set forth above, Ely and the Co-Conspirators knowingly joined Halls in fraudulently depriving Blackbird of the Deposit through the breach of Halls' fiduciary duties owed to Blackbird.

184.     Because Ely and the Co-Conspirators knowingly joined Halls in fraudulently depriving Blackbird of the Deposit in breach of Halls' fiduciary duties to Blackbird, they are jointly and severally liable with Halls.

185.     Worth's, Ely's, and the Co-Conspirators' actions thus were willful and malicious and intentionally fraudulent.

186.     Blackbird has been damaged by Worth's, Ely's and the Co-Conspirators' actions.

## COUNT V
### (Civil Conspiracy against all Defendants)

187.     Blackbird incorporates all previous paragraphs as if fully set forth herein.

188.     Upon information and belief, Worth, Ely, Halls, SION, SION FZE, Barber, NaPo Limited, Korakianitis, GT Foundation, and Singh have combined by engaging in conduct with a common design (1) to deprive Blackbird of the Deposit and (2) prevent Blackbird from pursuing legal action against Defendants, based on false representations that Worth would supply the Loan to Blackbird according to an ever-delayed timeline as described more specifically above.

189.     By entering into multiple transactions and consistently representing that the Deposit soon would be returned, Defendants engaged in common action.

190.     Blackbird believes and therefore alleges that Defendants have engaged in the aforesaid unlawful conduct in order to accomplish their collective scheme.

191.     As set forth more fully above, Defendants have acted with actual malice and with a wanton and willful disregard of Blackbird's rights.

192.     Defendants' actions thus were willful and malicious and intentionally fraudulent.

193.     As a direct and proximate result of Defendants' actions, Blackbird has suffered, and continues to suffer, substantial damages.

## COUNT VI
### (Fraud against all Defendants)

194.    Blackbird incorporates all previous paragraphs as if fully set forth herein.

195.    As set forth more fully above, the Defendants each made false representations in connection with the Lending Agreement, Settlement Agreement, Deposit Agreement, Affidavit, and SKR in order to induce Blackbird into entering into those agreements, paying the Deposit, and otherwise refraining from taking legal action to secure the return of the Deposit, funding of the Loan, and compensation for its damages.

196.    Defendants made these statements knowing they were false or recklessly and without regarding for the truth in order to induce Blackbird into entering into those agreements, paying the Deposit, and otherwise refraining from taking legal action.

197.    Defendants made these statements with the intent that Blackbird would rely on them to pay the Deposit and refrain from taking legal action.

198.    Blackbird reasonably relied upon these representations (individual and joint) to its detriment, and as a consequence, it has lost the Deposit, never was provided with the Loan, lost business opportunities, and incurred other damages.

199.    Defendants' actions were willful and malicious and intentionally fraudulent.

200.    As a direct and proximate result of these false representations, Blackbird has suffered, and continues to suffer, substantial damages.

## COUNT VII
### (Concealment or Fraudulent Non-Disclosure against all Defendants)

201.    Blackbird incorporates all previous paragraphs as if fully set forth herein.

202.     Due to the nature of the Lending Agreement, Settlement Agreement, Deposit Agreement, Affidavit, and SKR, and because various of the Defendants have taken possession of Blackbird's property in the form of the Deposit without returning it (and without justification), Blackbird and Defendants were in fiduciary and other relationships that gave Defendants a duty to disclose the true whereabouts of the Deposit and why it could not be returned and the Loan could not be funded.

203.     Defendants knew of the nature of the transactions and all of the parties to those transactions, the true location and any improper uses of the Deposit, as well as the true reason the Deposit has not been returned and the Loan has not been funded.

204.     Defendants' actions thus were willful and malicious and intentionally fraudulent.

205.     Defendants' failure to disclose the nature of the transactions and all of the parties to those transactions was a substantial factor in causing Blackbird's damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks relief as follows:

1.     awarding Blackbird actual damages, including nominal, compensatory, consequential and/or punitive damages, in an amount to be determined at trial, but in any event, no less than $22,000,000;

2.     awarding Blackbird pre- and post-judgment interest in an amount to be determined at trial;

3.     awarding Blackbird its reasonable attorney fees, costs, and expenses incurred in this action; and

4.      awarding Blackbird such other and further relief as the Court deems equitable, just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury as to all matters so triable.

DATED this 20th day of January, 2021.

BROWNSTEIN HYATT FARBER SCHRECK, LLP

*s/Martine T. Wells*
Martine T. Wells, Utah Bar No. 16249
BROWNSTEIN HYATT FARBER SCHRECK, LLP
410 Seventeenth Street, Suite 2200
Denver, CO   80202-4432
Telephone:     303-223-1100
Fax:               303-223-1111
Email:           mwells@bhfs.com

*Attorney for Plaintiff*